2016-0207 (La.App. 4 Cir. 11/16/16)

**BOES IRON WORKS, INC.**

v.

**GEE CEE GROUP, INC., Gibson C. Chigbu and the Gee Cee Company of LA, Inc.**

NO. 2016–CA–0207

Court of Appeal of Louisiana, Fourth Circuit.

NOVEMBER 16, 2016

Keith L. Magness, LAW OFFICE OF KEITH L. MAGNESS, LLC, 901 Derbigny Street, Gretna, LA 70053, COUNSEL FOR PLAINTIFF/APPELLANT

Louis R. Koerner, Jr., KOERNER LAW FIRM, 1204 Jackson Avenue, New Orleans, LA 70130, COUNSEL FOR DEFENDANT/APPELLANT

(Court composed of Judge Dennis R. Bagneris, Sr., Judge Roland L. Belsome, Judge Rosemary Ledet)

Judge Rosemary Ledet

This is a suit by a subcontractor against a general contractor alleging,

among other things, breach of contract and violation of the prompt pay and misapplication of funds statutes. La. R.S. 9:2784 (prompt pay statute); La. R.S. 9:4814 (misapplication of funds statute). Boes Iron Works, Inc. ("Boes"), the subcontractor, commenced this case against the following three related defendants: Gee Cee Group, Inc. ("Gee Cee Group"); The Gee Cee Company of LA, Inc. ("Gee Cee LA"); and Gibson Chigbu, the president of both Gee Cee Group and Gee Cee of LA (collectively "Defendants"). Boes contends that Defendants are liable to it for failing to pay an amount due. Defendants responded by filing an exception of prescription, which the trial court denied.

Following a bench trial, the trial court found in Boes' favor on the principal amount due, awarded penalties under the prompt payment statute, denied penalties under the misapplication of funds statute, awarded legal interest from the date of judicial demand, and costs and attorneys' fees to be fixed at a later date. Following a subsequent hearing, the trial court awarded Boes $8,000.00 in attorneys' fees and $5,000.00 in costs. Both Boes and Defendants appealed. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, Entergy contacted Gee Cee Group, a Louisiana commercial (nonresidential) construction company, regarding a project to repair and renovate Entergy's Gas Department Warehouse located on Perdido Street in New Orleans, Louisiana (the "Project"). Entergy requested that Gee Cee Group present a proposal for the Project. To do so, Gee Cee Group contacted various subcontractors, including Boes, to obtain quotes to incorporate into its proposal. Entergy accepted Gee Cee

Group's proposal. Thereafter, Gee Cee Group accepted Boes' quote to perform certain structural steel and iron work in connection with the Project.

On December 27, 2001, Boes completed its work on the Project and submitted two invoices to Gee Cee Group—No. 026497 in the amount of $29,988.00; and No. 026498 in the amount of $3,332.00 (a total amount of $33,320.00) (the "Invoices"). The Invoices reflected that Boes, for internal record keeping and tracking purposes, assigned the Project the job number 1079. On the bottom of each invoice, in small print, was the following language:

> Notwithstanding anything to the contrary provided for herein, payment by the contractor and/or owner to Boes Iron Works, Inc. shall be due on or before the 20th day of the month following submission of invoices by Boes Iron Works, Inc. Failure to pay said invoice(s) so submitted when due shall entitle Boes Iron Works, Inc. to recover from the contractor and/or owner interest at the rate of one and one-half (1 ½) percent per month on the outstanding unpaid balance from due date until paid, all reasonable attorney's fees incurred by Boes Iron Works, Inc. in connection with the collection with such past due balance, all in addition to the outstanding unpaid principle [sic] balance. Should job be discontinued, final billing shall not be determined by "Bill to Date" amount.

Based on the above language, the Invoices were due on January 20, 2002.

At trial, Craig Boes, Boes' operations manager, testified that, while the Invoices state that the amounts were due on or before the 20th day following submission of the invoices, the contract between the parties for the Project included a "pay-when-paid" term.[1] Based on that term, as

1. Addressing the meaning of a "pay when paid" provision, this court recently noted:

the trial court noted, "Boes expected payment from Mr. Chigbu once Entergy paid Mr. Chigbu for the work previous done by Boes." Thus, the payment due date hinged on the date that Entergy paid Gee Cee Group. The exact date on which Entergy paid Gee Cee Group, however, was never established at trial; instead, it was simply established that Entergy paid Gee Cee Group "sometime in 2003."

It is undisputed that Defendants made no payments to Boes for its work on the Project until 2010. As a result, in September 10, 2009, Mr. Boes' son, who was a manager of Boes, emailed Mr. Chigbu a copy of the Invoices, indicating a $33,320.00 outstanding balance. Sometime in April 2010, Mr. Boes and Mr. Chigbu met and discussed the Invoices. At this time, Mr. Boes and Mr. Chigbu had been doing business together for years and were personal friends. Mr. Boes testified that had Mr. Chigbu not personally guaranteed payment of the Invoices, Boes would have immediately filed suit in 2010.

Mr. Boes also testified that he [4]was unaware at the time of his April 2010 meeting with Mr. Chigbu of the distinction between Gee Cee Group and Gee Cee LA.[2]

On May 11, 2010, Mr. Chigbu sent a follow-up email to Mr. Boes, stating the following:

> As I said while I visited last time, I would be back with you soon and it may take until Monday May 10 to get back with you. Sorry, it has taken a day more. I will send you a $5,000.00 check towards that account and will pay intermittent payments until all amount[s] are paid within the next 36 months or we are able to negotiate a one time or twice payoff amount. Got to figure out where and how to place this bill. Anyway, thanks.

On June 16, 2010, Gee Cee LA issued a check in the amount of $5,000.00; and, on September 3, 2010, Gee Cee LA issued a second check in the amount of $11,500.00. On both of the checks, it was noted that

"Most courts hold that [the ['pay-when-paid'] type of clause at least means that the contractor's obligation to make payment is suspended for a reasonable amount of time for the contractor to receive payment from the owner. The theory is that a 'pay-when-paid' clause creates a timing mechanism only. Such a clause does not create a condition precedent to the obligation to ever make payment, and it does not expressly shift the risk of the owner's nonpayment to the subcontractor...."
*Tymeless Flooring, Inc. v. Rotolo Consultants, Inc.*, 14–1392, p. 1, n. 1 (La.App. 4 Cir. 5/20/15), 172 So.3d 145, 146 (quoting *MidAmerica Const. Management, Inc. v. MasTec North America, Inc.*, 436 F.3d 1257, 1261–62 (10th Cir. 2006)).

2. The relationship between the two corporate entities—Gee Cee Group and Gee Cee LA—requires explanation. At the hearing on the prescription exception, Mr. Chigbu explained that Gee Cee Group was heavily involved with the Harrah's Casino project, which went bankrupt. As a result, Gee Cee Group suffered financial problems. Rather than file bankruptcy, Mr. Chigbu testified that he decided to form a new company. For this reason, he formed Gee Cee LA in 1997. The record reflects that from 1997 to 2006 Gee Cee Group and Gee Cee LA co-existed. In 2001, Entergy approached Gee Cee Group regarding the Project. Mr. Chigbu explained that the reason for this was because Gee Cee Group was "the only entity that was in the Entergy system." At that time, Gee Cee Group was otherwise an inactive corporate entity. Mr. Chigbu explained that between 1997—when Gee Cee LA was created—and 2005—when Hurricane Katrina struck the area—the only work that Gee Cee Group did was the Entergy job—the Project. He testified that "[t]here was no other business don[e by] Gee Cee Group after all the Harrah's difficulty except for the Entergy job, and that was only because that was the name in the Entergy system." Following Hurricane Katrina—roughly in 2006—Gee Cee Group was abandoned. The record further reflects that the Louisiana Secretary of State revoked Gee Cee Group's corporate charter in November 2009.

the payments were being made to Boes for its Job No. 1079, which was the number that Boes assigned to the Entergy project. On June 7, 2011, Mr. Boes' son again emailed Gee Cee LA, through Mr. Chigbu, an invoice on Job No. 1079 for the remaining balance due of $16,820.00. No interest calculation was included on that invoice.

On November 28, 2012, Mr. Boes' son faxed an invoice to Gee Cee LA showing a balance of $82,739.80. This amount included not only the remaining |₅balance due of $16,820.00, but also interest calculated at 1½% per month (18% per annum) (the rate set forth on the Invoices).[3] On December 27, 2012, Boes' attorney sent a formal written demand to Gee Cee Group setting forth the same amount due of $82,739.80.

On February 19, 2013, Boes filed this suit against Defendants. In response, Defendants filed various exceptions, including a peremptory exception of prescription. On February 5, 2014, an evidentiary hearing was held on the prescription exception.[4] Following the hearing, the trial court denied the exception.

On October 12, 2015, a bench trial was held in this matter. At trial, two witnesses testified—Mr. Chigbu and Mr. Boes. Following trial, the trial court ruled in Boes' favor. In its written reasons for judgment, the trial court recapped its prior findings in denying Defendants' prescription exception as follows:

> This Court previously found that the April 2010 meeting and subsequent May 11, 2010 email from Mr. Chigbu served as a new promise by Gee Cee Company of LA to pay the debt of the closed Gee Cee Group, Inc. This Court previously found that Mr. Chigbu's meeting in April 2010 with Mr. Boes and Mr. Chigbu's follow up email on May 11, 2010 served to interrupt prescription and essentially acknowledged or guaranteed payment of a debt owed. Further, Mr. Chigbu, on behalf of Gee Cee Group of LA, issued two payments totaling $16,500.00 for Boes' Job No. 1079. In the Court's April 4, 2015 judgment, this Court found that Mr. Chigbu, on behalf of the new company, Gee Cee Group of LA, had a pecuniary interest (and thus received a benefit) by making a new agreement and promising to pay the debt of his former company. Gee Cee Group, in light of his continued business relationship with Boes Iron Works.[5]

|₆Given those findings, the trial court summarized the remaining issues before it at trial as follows:

1. Whether Mr. Boes contracted with Gee Cee Group or with Gee Cee LA, and whether Gee Cee LA was merely an alter ego of Gee Cee Group;

2. The terms of the April 2010 agreement between Mr. Chigbu and Mr. Boes regarding the debt, including whether the language in the Invoices entitled Boes to one and one half percent per month on outstanding un-

---

3. The interest amounts were $51,479.40, $499.80, and $13,940.60 for the periods December 27, 2001 to August 4, 2010; August 4, 2010, to September 3, 2010; and September 3, 2010, to December 3, 2012, respectively.

4. Defendants also filed an exception of no right of action and motion for summary judgment, which were both denied.

paid balances not paid by the due date was binding on Mr. Chigbu; and

3. Whether Boes is entitled to penalties, attorneys' fees, and costs.

As to the alter ego issue, the trial court found that Gee Cee LA was an alter ego or a mere continuation of Gee Cee Group and thus responsible for its debts. As to the terms of the new April 2010 agreement, the trial court found that Defendants continued to owe Boes for the remaining unpaid balance of $16,820.00 and that "it is clear that Boes is entitled to collect interest on the remaining unpaid balance." Finally, as to penalties, attorneys' fees, and costs, the trial court found that Boes was entitled to penalties under the prompt pay statute, La. R.S. 9:2784, but not under the misapplication of funds statute, La. R.S. 9:4814. The trial court thus rendered judgment in Boes' favor for the principal sum

of $16,820.00, penalties of $4,998.00, and judicial interest as provided for by law.

Following a separate hearing on the issue of attorneys' fees and costs, the trial court rendered judgment awarding Boes $8,000.00 in attorneys' fees, $5,161.81 in costs, and legal interest on said amounts as provided by law. From the trial court's rulings, both Boes[6] and Defendants[7] appeal.

## |₇DISCUSSION

For ease of discussion, we divide our analysis of the issues presented by the parties into the following eight categories: (i) standard of review; (ii) alter ego or continuation doctrine; (iii) open account versus contract claim; (iv) detrimental reliance claim; (v) prompt pay claim; (vi) misapplication of funds claim; (vii) interest; and (viii) attorneys' fees. We separately address each category

**6.** Boes asserts the following three assignments of error:

1. The trial court erred in limiting Boes' attorneys' fees award to $8,000.00 when the record shows that the underlying matter required multiple court appearances, three depositions, over 200 written discovery requests were propounded to Boes, and defendants filed multiple exceptions and a motion for summary judgment, and routinely filed reply, surreply, and post-hearing memoranda to which Boes was required to respond.
2. The trial court erred by denying Boes' misapplication claim when Gibson Chigbu, Gee Cee Group's principal, admitted the funds paid to Gee Cee Group by Entergy for Boes' work on the Perdido Street warehouse project were deposited into Gee Cee Group's general operating account, and used to pay other bills of the business.
3. To the extent the trial court only awarded Boes interest from the date of judicial demand and not from the date payment was due, the trial court erred as Louisiana law provides that when the object of performance is a sum of money, damages for delay in performance are measured

by the interest on that sum from the time it is due.

**7.** The Defendants assert the following four assignments of error:

1. The claim for penalties under La R.S. 9:2784 was granted even though it was prescribed by the lapse of at least two years after December 21, 2001, had prescribed on May 11, 2010, and could not be acknowledged.
2. Under normal circumstances, the manifest error rule would be applicable to the factual findings of the district court and its characterization of the relationship of Boes and Gee Cee Group. Here, however, the facts were undisputed. Consequently, the district court's "factual" conclusions were actually legal conclusions entitled to no deference.
3. Gee Cee LA was found to be a mere continuation of Gee Cee Group although the conditions for this doctrine were not met.
4. The doctrine of detrimental reliance should have been applied to bar Boes and Mr. Boes from taking a position contrary to its and his prior acts, admissions, representations, and silence.

*Standard of review*

Three different standards of review are applicable here—abuse of discretion, manifest error, and de novo. An abuse of discretion standard applies to the attorneys' fees award issue. The jurisprudence has recognized that "[t]he trial court ₈is vested with great discretion in arriving at an award of attorney fees. The exercise of this discretion will not be reversed on appeal without a showing of clear abuse of discretion." *Troth Corp. v. Deutsch, Kerrigan & Stiles, L.L.P.*, 06–0457, p. 3 (La. App. 4 Cir. 1/24/07), 951 So.2d 1162, 1165 (citing *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067, 1070 (La. 1983).

To the extent the issues presented on appeal involve fact questions or mixed questions of law and fact, the manifest error applies. To the extent the issues involve questions of law, the *de novo* standard applies.[8] Summarizing the manifest error and *de novo* standards, this court noted in *Bates v. City of New Orleans*, 13–1153, 13–1587 (La. App. 4 Cir. 3/26/14), 137 So.3d 774, 780, the following:

> This court reviews a trial court's factual findings under a manifest error standard. The manifest error standard is one "of great deference to the factual findings of the trier of fact." 1 Frank L. Maraist & Harry T. Lemmon, La. Civ. L. Treatise, CIVIL PROCEDURE § 14:14 (1999). The phrase "manifestly erroneous," in its simplest terms, means "clearly wrong." Id. (citing *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La. 1978)). "Mixed questions of law and fact

are also reviewed under the manifest error standard." *Jones v. Capitol Enterprises, Inc.*, 11–0956, pp. 10–11 (La.App. 4 Cir. 5/9/12), 89 So.3d 474, 483, *writ denied*, 12–1634 (La. 10/26/12), 99 So.3d 651 (citations omitted).

Pure questions of law are reviewed under a *de novo* standard "without deference to the legal conclusions of the courts below." *Durio v. Horace Mann Ins. Co.*, 11–0084, p. 14 (La. 10/25/11), 74 So.3d 1159, 1168; *see also Burnette v. Stalder*, 00–2167, p. 5 (La. 6/29/01), 789 So.2d 573, 577 (noting that a *de novo* review standard applies to issues of statutory construction); *Henderson v. Bigelow*, 07–1441, p. 8 (La.App. 4 Cir. 4/9/08), 982 So.2d 941, 946. As to ₉questions of law, "the standard of review of an appellate court is simply whether the court's interpretive decision is legally correct." *Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C.*, 10–1303, p. 4 (La. App. 4 Cir. 9/21/11), 75 So.3d 471, 474 (citing *Glass v. Alton Ochsner Medical Foundation*, 02–0412, p. 3 (La.App. 4 Cir. 11/6/02), 832 So.2d 403, 405).

*Alter ego or continuation doctrine*

Defendants contend that the trial court legally erred in applying the continuation doctrine to find that Gee Cee Company LA was responsible for Gee Cee Group's debt given that a threshold requirement for applying the doctrine was not met. Defendants cite this court's holding in *Pichon v. Asbestos Defendants*, 10–0570, p. 6 (La.App. 4 Cir. 11/17/10), 52 So.3d 240, 244, that "[a] threshold require-

---

8. We acknowledge, as Defendants contend, that when "there is no dispute as to the dispositive facts, the issue can be decided as a matter of law and the review is *de novo*." *Nunez v. Pinnacle Homes, L.L.C.*, 15–0087, p. 7 (La. 10/14/15), 180 So.3d 285, 290 (citing *Kevin Associates, L.L.C. v. Crawford*, 03–0211, p. 15 (La. 1/30/04), 865 So.2d 34, 43); *see also Felix v. Safeway Ins. Co.*, 15–0701, pp. 7– 8 (La.App. 4 Cir. 12/16/15), 183 So.3d 627, 632 (citing *Kevin Associates, supra,* and noting that "the relevant facts here are undisputed; and the questions presented are purely legal. Accordingly, we apply a *de novo* standard of review."). Such is not the case, however, as to all of the other issues, besides the attorneys' fees issue, presented on this appeal.

ment to trigger a determination of whether successor liability is applicable under the 'continuation' exception is that one corporation must have purchased 'all' the assets of another." [9] Defendants note that it is undisputed no asset transfer occurred between Gee Cee Group and Gee Cee LA.[10] Boes counters that an asset transfer is not absolutely required for Gee Cee LA to be found responsible for Gee Cee Group's debt to Boes.

The trial court, agreeing with Boes,[11] found that "while Boes actually contracted with Gee Cee Group, Inc. and not Gee Cee Company of LA, Gee Cee Company of LA was merely a continuation of the old corporation and thus responsible for the debts and obligation of Gee Cee Group, Inc." In support, the trial court quoted this court's statement in *Biller v. Snug Harbor Jazz Bistro of Louisiana, L.L.C.*, 11–1784, p. 4 (La.App. 4 Cir. 9/5/12), 99 So.3d 730, 732, that "[i]n *Wolff* [*v. Shreveport Gas, Electric Light & Power Co.*, 138 La. 743, 759, 70 So. 789, 794 (1916)], the Louisiana Supreme Court held that a newly organized corporation would be liable as the successor of the old ... when the circumstances attending the creation of the new and its succession to the business and property of the old were of such a character as to

warrant a finding the new corporation was merely a continuation of the old." *Id.*

In further support, the trial court cited the following facts:

Both Gee Cee Group, Inc. and Gee Cee Company of LA, Inc. were in existence from 1997 and 2006, at which time Gee Cee Group, Inc., was abandoned after Hurricane Katrina. At trial, Mr. Chigbu testified that they were two separate companies, but had the same mailing address, same phone and fax numbers and he served as the president of both. Mr. Chigbu testified that Gee Cee Group, Inc., was almost bankrupted because one of his clients, Harrah's Casino, filed for bankruptcy, causing financial hardship for Gee Cee Group, Inc. As a result, Mr. Chigbu no longer conducted business under that company anymore, but he formed Gee Cee Company of LA instead. Mr. Chigbu testified that Gee Cee Group, Inc., was already the approved vendor with Entergy when the job at issue [the Project] was awarded so he did not correct them to change it to Gee Cee Company because Gee Cee Group, Inc. was already on their approved list.

We agree with Defendants that the trial court's reliance on the continuation

---

**9.** Defendants also cite *Bank of Am., N.A. v. Garden Dist. Pet Hosp., Inc.*, 2016 WL 952250, p. *8 (E.D. La. 3/14/16), in which the federal district court stated:

[A]s Louisiana courts have noted, "[a] threshold requirement to trigger a determination of whether successor liability is applicable under the 'continuation' exception is that one corporation must have purchased all or substantially all of the assets of another." *See J.D. Fields & Co. v. Nottingham Const. Co., LLC*, 2015–0723, 2015 WL 6875153, at *7, 184 So.3d 99 (La. App. 1 Cir. 2015); *Pichon v. Asbestos* Defendants, 52 So.3d 240, 244 (La. App. 4 Cir. 2010) (same); *see also Comardelle v. Pennsylvania Gen. Ins. Co.*, No. CIV.A. 13–6555, 2014 WL 7139436, at *3 n. 31 (E.D. La.

Dec. 15, 2014) (doubting that successor liability doctrine applied when predecessor corporation did not sell substantially all of its assets to alleged successor).

**10.** Defendants also note that the Harrah's bankruptcy was a valid reason for the creation of the new corporation (Gee Cee LA) in 1997 and that all of the assets of Gee Cee Group were destroyed in Katrina in 2005, long before which Gee Cee Group was dormant.

**11.** In its petition, Boes averred that "Gee Cee [LA] is the alter ego and/or mere continuum of Gee Cee Group ... thereby making Gee Cee [LA] liable for the debts of Gee Cee Group."

doctrine is misplaced; the threshold requirement of an asset transfer is lacking here. ₁₁*Pichon, supra.*[12] Nonetheless, we find the single business enterprise doctrine ("SBE")—another veil piercing doctrine—applies and dictates the same legal result.

Generally, the determination of whether the SBE doctrine applies is a question of fact for the trial court to decide. *Grayson v. R.B. Ammon & Associates, Inc.*, 99–2597, pp. 20–21 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, 15 (citing *Brown v. Automotive Casualty Ins. Co.*, 93-2169, p. 8 (La.App. 1 Cir. 10/7/94), 644 So.2d 723, 728). Here, however, the trial court applied a different doctrine and thus did not apply the SBE doctrine. For this reason, we review this issue *de novo. Dishon v. Ponthie*, 05–659, p. 6 (La.App. 3 Cir. 12/30/05), 918 So.2d 1132, 1136 (noting that "[a]s the

trial court did not apply it [the SBE doctrine], we will perform a de novo review on this issue.").

Simply stated, the SBE doctrine is invoked "to break down corporate walls between affiliated corporations." Glenn G. Morris and Wendell H. Holmes, 8 La. Civ. L. Treatise, BUSINESS ORGANIZATIONS § 32.15 (2016). The SBE applies when a corporation is found to be the "alter ego, agent, tool or instrumentality of another corporation." *Green v. Champion Ins. Co.*, 577 So.2d 249, 257 (La. App. 1st Cir. 1991). In *Green*, the First Circuit Court of Appeal adopted the SBE doctrine[13] and enumerated a non-exclusive, eighteen-factor test to determine ₁₂whether a group of affiliated entities constitutes a SBE (the "*Green* factors").[14] The *Green* factors examine the substance

---

12. As noted elsewhere in this opinion, Gee Cee Group and Gee Cee LA co-existed as legal entities for most of the pertinent time period; Gee Cee LA was incorporated in 1997, and the Louisiana Secretary of State revoked Gee Cee Group's corporate charter in November 2009.

13. This circuit adopted and applied the SBE for the first time in *In re New Orleans Train Car Leakage Fire Litig.*, 96–1677, p. 3 (La.App. 4 Cir. 3/5/97), 690 So.2d 255, 257 (citing *Green, supra*), and has continued to apply the theory in subsequent cases. *Sarpy v. ESAD, Inc.*, 07–0347, pp. 4–5 (La.App. 4 Cir. 9/19/07), 968 So.2d 736, 738; *see also Lee v. Clinical Research Center of Florida, L.C.*, 04–0428, p. 7 (La.App. 4 Cir. 11/17/04), 889 So.2d 317, 323 (noting that "[t]his Court has also recognized the single business enterprise theory as a vehicle for holding a group of affiliated entities responsible for the obligations of one of the entities."); *Hopkins v. Howard*, 05–0732, p. 14 (La.App. 4 Cir. 4/5/06), 930 So.2d 999, 1008 (noting that the SBE doctrine is "an equitable doctrine, similar to the piercing of the corporate veil, under which the courts may disregard a company's separate corporate existence and require the aggregation of its assets with an affiliated company to satisfy liabilities or claims of creditors.").

14. The *Green* factors are as follows:
1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;
2. common directors or officers;
3. unified administrative control of corporations whose business functions are similar or supplementary;
4. directors and officers of one corporation act independently in the interest of that corporation;
5. corporation financing another corporation;
6. inadequate capitalization ("thin corporation");
7. corporation causing the incorporation of another affiliated corporation;
8. corporation paying the salaries and other expenses or losses of another corporation;
9. receiving no business other than that given to it by its affiliated corporations;
10. corporation using the property of another corporation as its own;
11. noncompliance with corporate formalities;
12. common employees;
13. services rendered by the employees of one corporation on behalf of another corporation;
14. common offices;

of the corporation's structure, as opposed to its form, to determine whether a group of affiliated entities constitutes a SBE. *Green*, 577 So.2d at 257. The *Green* factors are similar to factors that have been used in Louisiana "piercing the veil" cases. *Green*, 577 So.2d at 258; *see also In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 787 (Bankr. W.D. La. 2013) (noting that the SBE doctrine is "grounded on the same policies and doctrinal underpinnings as traditional veil-piercing theories such as the alter ego doctrine.").

Considering the *Green* factors, which we note are substantially similar to those considered in applying the continuation doctrine,[15] we find that Gee Cee Group and Gee Cee LA are a SBE. In so finding, we note that equity, not fraud, dictates the application of the SBE doctrine here.[16] Accordingly, we find no error in the trial court's finding that Gee Cee LA is liable for Gee Cee Group's debts.

*Open account versus contract claim*

█ As part of their exception of prescription, Defendants argued that Boes' claim is not based upon contract, subject to a ten-year prescriptive period, but based upon an open account, subject to a three-year prescriptive period.[17] On appeal, Defendants dispute not only the trial court's determination that the parties' relationship was contractual, but also the trial court's related determination that Mr. Chigbu acknowledged Gee Cee Group's debt to Boes, which started the ten-year prescription period anew in 2010.

According to Defendants, the relationship between Mr. Boes' and Mr. Chigbu's respective companies was sometimes contractual—when there was a formal bid process and a written subcontract—and sometimes based on open account. Defendants' contends that the relationship between the parties on the Project was based on an open account. Defendants emphasize that the Invoices were the only available written documentation the parties were able to produce regarding their relationship on the Project.[18] Defendants contend that the Invoices established an open account relationship, that Boes' cause of action on an open account has prescribed,

15. centralized accounting;
16. undocumented transfers of funds between corporations;
17. unclear allocation of profits and losses between corporations; and
18. excessive fragmentation of a single enterprise into separate corporations.

*Green*, 577 So.2d at 257–58. The *Green* factors are not an exhaustive list. *Id.* at 258. Moreover, no one of the factors is dispositive on the SBE issue. *Id.*

15. The following eight factors have been applied in determining whether a new company is a mere continuation of an older company:

1. retention of the same employees;
2. retention of the same supervisory personnel;
3. retention of the same production facility in the same physical location;
4. production of the same product;
5. retention of the same name;
6. continuity of assets;
7. continuity of general business operations; and

8. whether the successor holds itself out as the continuation of the previous enterprise.

*Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 390 (5th Cir. 2000).

16. *See In re Scully's Aluminum Crafts, Inc.*, 352 B.R. 783, 787 (Bankr. W.D. La. 2006) (citing *Brown, supra*) (noting that "Louisiana courts have held that a court may disregard the concept of corporate separateness and extend liability to each of the affiliated corporations for the purpose of preventing fraud or achieving equity when the court has found that a group of affiliated corporations constitutes a [SBE].").

17. *See* La. C.C. art. 3494 (providing that a three year prescriptive period applies to "[a]n action on an open account."); La. C.C art. 3499 (providing that "[u]nless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years.").

18. All other documentation that may have existed was destroyed as a result of the flood-

and that its cause of action could not be acknowledged by Mr. Chigbu in 2010.

 The issue of whether the relationship between the parties was based upon contract, as opposed to an open account, presents a question of fact subject to a manifest error standard of review. Resolving the issue in Boes' favor, the trial court noted that there was a long-standing working relationship between the heads of both entities—Mr. Chigbu and Mr. Boes. The trial court found Mr. Boes' testimony regarding the customary procedure the entities employed in entering into contracts for jobs to be credible and that the parties used that customary procedure on the Project.[19] The trial court thus found there was valid contract between Gee |15Cee Group and Boes. Under that original contract, Boes was to provide iron work for the Project in exchange for a total payment of $33,320.00.

Regardless, Defendants contend that Mr. Chigbu neither acknowledged nor promised to pay Gee Cee Group's debt to Boes. According to Defendants, Mr. Chigbu's May 11, 2010 email was, at best, "a new offer to pay and a new agreement;" it

was not an acknowledgement. Defendants point out that Mr. Chigbu testified he believed he and Mr. Boes reached a new agreement at their April 2010 meeting. Under that new agreement, Gee Cee LA would pay the face amount of the Invoices (a total of $33,000.00) within thirty-six months (three years). Defendants contend that Mr. Boes repudiated that understanding and denied that there was a new agreement between them.

 The trial court found that the April 2010 meeting between Mr. Boes and Mr. Chigbu, coupled with Mr. Chigbu's May 11, 2010 email and the checks subsequently issued through Gee Cee LA to Boes, constituted both an acknowledgement of the underlying debt sufficient to interrupt prescription and a new agreement to pay the remaining debt. The trial court noted that both the checks indicated that they were payments for Boes' Job No. 1079. The trial court thus concluded that "Mr. Chigbu, on behalf of [Gee Cee LA] ... had a pecuniary interest (and thus received a benefit)[20] by making a new agreement and thus |16promising to pay the debts of his former company, Gee Cee

---

ing of the parties' respective offices due to Hurricane Katrina, which struck the New Orleans area in August 2005. The trial court noted that, for this reason, "both parties agree that there is no written evidence of the contract." Nonetheless, the trial court cited as applicable here La. C.C. art. 1832, which provides that "[w]hen the law requires a contract to be in written form, the contract may not be proved by testimony or by presumption, unless the written instrument has been destroyed, lost, or stolen."

19. At the hearing on the prescription exception, Mr. Boes also testified that he understood the parties had a contractual relationship because the scope of work was provided for, because he "believe[d] there was also a Certificate of Insurance that was sent, which is normal during the course of business with a contract," and because a retainage was withheld on the Project. Indeed, one of the In-

voices was for the 10% retainage on the Project. He testified that "[o]n an open account, you don't withhold retainage."

20. The relevance of this finding that Mr. Chigbu had a pecuniary interest is the application of an exception to the rule against using parol evidence to establish a promise to pay the debt of a third person. See La. C.C. art. 1847 (providing that "[p]arol evidence is inadmissible to establish ... a promise to pay the debt of a third person...."). The exception to this rule applies when the oral promise to pay is prompted by a pecuniary or business motivation on the part of the promisor. Deutsch, Kerrigan & Stiles v. Fagan, 95–0811, 95–0812 (La. App. 1 Cir. 12/15/95), 665 So.2d 1316, 1320. As this court noted in Manufacturas Industriales Del Caribe, S. de R.L. de C.V. v. Kathryn Arnett Studio, L.L.C., 05–1174, pp. 4–5 (La.App. 4 Cir. 5/10/06), 931 So.2d 1126, 1128, "[i]f the agreement to pay is not made

Group, in light of his continued business relationship with Boes Iron Works as president of Gee Cee Company of LA." We find no manifest error in the trial court's findings. Moreover, as we determined above, Gee Cee Group and Gee Cee LA are a SBE; thus, Gee Cee LA is responsible for Gee Cee Group's debts and obligations for that reason as well.

### Detrimental reliance claim

On appeal, Defendants raise a detrimental reliance claim.[21] To prevail on a detrimental reliance claim, a party must establish the following three elements: (i) a representation by conduct or word; (ii) justifiable reliance; and (iii) a change in position to one's detriment because of the reliance. *Louisiana Office of Risk Mgmt. v. Richard*, 13–0890, p. 5 (La. 10/15/13), 125 So.3d 398, 402 (citing *Suire v. Lafayette City–Parish Consol. Government*, 04–1459, p. 31 (La. 4/12/05), 907 So.2d 37, 59); *see* La. C.C. art. 1967.[22] The theory of detrimental reliance is intended to prevent injustice by precluding parties from taking a contrary position to their prior acts, admissions, representations, or silence. *Id.* Nonetheless, the Louisiana Supreme has cautioned that "it is difficult to recover under the theory of detrimental reliance, because estoppel is not favored in Louisiana law." *Louisiana Office of Risk Mgmt.,*

*supra* (citing *Doss v. Cuevas*, 07–1803, p. 4 (La.App. 1 Cir. 3/26/08), 985 So.2d 740, 743; *May v. Harris Management Corp.,* 04–2657, p. 6 (La.App. 1 Cir. 12/22/05), 928 So.2d 140, 145).

Defendants contend that all three elements necessary to give rise to detrimental reliance are present. According to Defendants, the three elements are satisfied for the following reasons:

- *Representation by conduct or word*—Defendants contend that Mr. Boes' actions led Mr. Chigbu to believe they reached a new agreement at their April 2010 meeting. Although this new agreement was never memorialized in writing, Mr. Chigbu sent an email which served as a follow up. In addition, when Mr. Chigbu received new invoices after sending the first checks and saw that the balance due had been reduced in accordance with the new agreement he believed was made, he was entitled to believe that the amount due was what was reflected on the new invoices.

- *Justifiable reliance*—Assuming there was no new agreement, Boes, by depositing the checks, reducing the balance due, and remaining silent when Mr. Chigbu mentioned a thir-

---

primarily to answer for another, but is impelled from the pecuniary or business motives of the promisor, then the promise to pay is, in effect, a new and independent agreement and parol evidence is admissible to establish the existence of the agreement." *Id.*

21. Boes contends that this claim is not properly before this court since it was not raised before the trial court. Defendants raised the detrimental reliance claim in their post-trial memorandum; however, the trial court did not expressly address it in its written reasons for judgment. The trial court, by failing to address this claim, implicitly rejected it. Because the claim was raised in the trial court, we find it appropriate to address it.

22. The doctrine of detrimental reliance is codified in La. C.C. art. 1967, which provides:

Cause is the reason why a party obligates himself.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

ty-six months' term in his email, conducted itself in such a way as to lead Mr. Chigbu reasonably to believe that there was such an agreement.

- *A change in position to one's detriment because of the reliance*—Mr. Chigbu would never have made any payments to Boes if he had known that Boes would claim thousands of dollars of interest. The only reason why Gee Gee LA made any payment to Boes was because Mr. Chigbu believed there was an agreement to pay only the face amount of the Invoices. Defendants thus contend that the payments they made were of a thing not due by Gee Cee LA, an entity not liable in any way.

Boes counters that Defendants' detrimental reliance claim is based on Defendants' mistaken belief that during the parties' April 2010 meeting a new agreement was reached whereby Boes, without any financial consideration, agreed to waive interest and attorneys' fees under the Invoices and to provide Defendants ⌊18an additional thirty-six months (three years) to pay the Invoices. Boes notes that Mr. Boes testified at trial that he did not make any such new agreement and that Mr. Chigbu testified to the contrary. Boes contends that the trial court weighed the testimony and obviously determined that no such agreement with those terms had been reached.

The jurisprudence has recognized that "detrimental reliance usually comes into play when no written contract exists or the contract is found to be unenforceable." *Jackson v. Lare*, 34,124, p. 7, n. 1 (La.App. 2 Cir. 11/1/00), 779 So.2d 808, 814. Such is not the case here. The trial court found there was both an original agreement and

an enforceable new agreement entered into between the parties in April 2010 for Defendants to pay the remaining outstanding balance of $16,820.00 for the Project. The trial court, however, did not accept all of either party's position regarding the terms of the new agreement.

As the trial court noted, Mr. Boes testified at trial that "he never agreed to a thirty-six month term to pay the remaining debt at the April 2010 meeting with Mr. Chigbu;" the trial court implicitly accepted Boes' position on that point. The trial court, however, rejected Boes' position that the 1½ % per month interest reflected on the Invoices applied; the trial court reasoned as follows:

> Conflicting testimony was offered regarding the terms of the plan to repay the debt, and Boes failed to establish whether the parties agreed on any particular interest rate to be charged for the remaining debt. While Boes argued that it was owed 1.5 percent interest per month on the remaining balance due, Mr. Chigbu argued that he never agreed to that condition, nor signed anything agreeing to that amount. As late as 2011, the invoices sent from Boes to Gee Cee Group, Inc. contained no charges for interest. However, it is clear that Boes is entitled to collect interest on the remaining unpaid balance. As the ⌊19amount of interest was not contractually agreed upon, Boes is entitled to judicial interest from the date of judicial demand.[23]

Given there is an enforceable contract, we find Defendants' detrimental reliance claim lacks merit.

*Prompt pay claim*

■ Defendants contend the trial court erred in awarding penalties to Boes under the prompt pay statute, La. R.S. 9:2784.[24]

---

**23.** The issue of whether judicial interest was properly awarded from the date of judicial

demand is addressed elsewhere in this opinion.

**24.** La. R.S. 9:2784 C provides as follows:

In making that award, the trial court noted that Mr. Chigbu admitted he was paid by Entergy for the work Boes performed sometime in 2003 and that he placed the funds in the company's general accounts, which was his standard practice. He, however, acknowledged that he failed to subsequently pay Boes. The trial court thus found Boes was entitled to a penalty under the prompt pay statute not to exceed fifteen percent of the outstanding balance owed, which the court calculated as $4,998.00—fifteen percent of the original balance owed in 2003 of $33,320.00.

On appeal, Defendants concede a violation of the prompt pay statute; however, they contend, as they did in the trial court,[25] that Boes' prompt pay claim is prescribed. The prompt pay statute, R.S. 9:2784, contains no prescriptive period. Defendants argue that the one case considering whether a prompt pay claim was prescribed applied a one-year prescriptive period and held that prescription would run no later than two years from the date on which payment was received. *Specialty Construction, LLC v. Jim Meyers Const. Co., LLP.*, 10–1378 (La.App. 1 Cir. 2/11/11) (*unpub.*), 2011 WL 846119.

Defendants' reliance on *Specialty Construction*, as Boes contends, is misplaced. In *Specialty Construction*, the appellate court expressly noted that the only issue before it was "whether the trial court erred in finding that the one-year period set forth in La. R.S. 9:4823(A)(2) for filing a lawsuit to enforce a claim and privilege granted by the Private Works Act begins to run on the date a statement of claim and privilege is filed into the mortgage records." 2011 WL 846119 at p.*2. *Specialty Construction* thus neither addressed nor held that actions filed pursuant to Louisiana's prompt pay statute, La. R.S. 9:2784, are subject to a one or two-year prescriptive period. Rather, the focus in *Specialty Construction* was the calculation of the deadline for filing suit to enforce a claim and privilege granted by the Private Works Act. As Boes points out, it did not file, and certainly did not sue to enforce, a Private Works Act claim. *Specialty Construction* is thus inapposite.

Given the Legislature failed to include a specific prescriptive period in La. R.S. 9:2784, Boes' prompt pay claim is subject to the ten year prescriptive period for personal actions under La. C.C. art. 3499.[26] The date on which the ten year

---

If the contractor or subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty in the amount of one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due. In addition, the contractor or subcontractor shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers. However, any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim.

25. Although this issue was raised in the trial court, the trial court made no express ruling on the issue. The trial court, by failing to address it, implicitly denied the exception.

26. *See* La. C.C. art. 3499 (providing that "[u]nless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years"); *Parry v. Administrators of Tulane Educ. Fund*, 02–0382, p. 16 (La.App. 4 Cir. 9/4/02), 828 So.2d 30, 40 (noting that "[a]s the introductory clause of that Article [La. C.C. art. 3499] provides, it is a 'catch-all provision' that covers personal actions not specifically covered by any other prescriptive period.").

prescriptive period commenced to run on Boes' prompt pay claim was fourteen ₂₁days after the date on which Gee Cee Group received payment from Entergy for the work. *See* La. R.S. 9:2784 C (providing that the prompt pay claims is based on the failure to pay fourteen days after the date "of the receipt of payment from the owner for improvements to an immovable."). The date on which Entergy paid Gee Cee Group is not identified in Boes' petition. Boes' petition thus is not prescribed on its face. Defendants, as the parties raising the prescription exception, thus had the burden of proving the claim was prescribed.[27]

■ At trial, the date on which Entergy paid Gee Cee Group for its work on the Project was never established; at best, it was established that Entergy paid Gee Cee Group "sometime in 2003." Given Boes' petition was filed in 2013 (on February 19, 2013), it cannot be said that Boes' petition is prescribed under the applicable ten year prescriptive period. Moreover, prescriptive periods are strictly construed against prescription and in favor of the obligation sought to be extinguished. *See Dugas v. Thompson*, 11–0178, p. 4 (La. App. 4 Cir. 6/29/11), 71 So.3d 1059, 1063.

Summarizing, we find the trial court did not err in awarding Boes penalties under the prompt pay statute. Moreover, we find that the prompt pay statute forms the basis for both the trial court's penalty award of $4,998.00 and its attorneys' fee award of $8,000.00 to Boes.

*Misapplication of funds claim*

■ ₂₂Boes contends that the trial court erred in rejecting its claim for penalties under the misapplication of funds statute, La. R.S. 9:4814.[28] Rejecting Boes' request for penalties under that statute, the trial court reasoned that it did "not find that the plaintiff proved at trial that Mr. Chigbu knowingly misapplied the funds owed to Boes."

On appeal, Boes contends that because Mr. Chigbu admitted that Gee Cee Group deposited Entergy's payments for Boes' work into its operating account and that it paid other business-related expenses instead of Boes, the trial court erred in failing to award penalties under the misapplication of funds statute. Noting the lack of jurisprudence interpreting the civil misapplication of funds statute, Boes cites in support of its contention a case construing the criminal misapplication of funds statute, La. R.S. 14:202.[29] *State v. Cohn*, 00–

27. Ordinarily, the mover for an exception of prescription bears the initial burden of showing the claims have prescribed. *See Scott v. Zaheri*, 14–0726, p. 7 (La.App. 4 Cir. 12/3/14), 157 So.3d 779, 784–85 (citing *Spott v. Otis Elevator Co.*, 601 So.2d 1355, 1361 (La. 1992)). If, however, prescription is evident based on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. *Zaheri*, 14–0726 at pp. 7–8, 157 So.3d at 785 (citing *Williams v. Sewerage & Water Bd. of New Orleans*, 611 So.2d 1383, 1386 (La. 1993)).

28. La. R.S. 9:4814 A provides:

No contractor, subcontractor, or agent of a contractor or subcontractor, who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement,

including contracts and mortgages for interim financing, shall knowingly fail to apply the money received as necessary to settle claims to sellers of movables or laborers due for the construction or under the contract. Any seller of movables or laborer whose claims have not been settled may file an action for the amount due, including reasonable attorneys' fees and court costs, and for civil penalties as provided in this Section.

29. La. R.S. 14:202 A provides:

No person, contractor, subcontractor, or agent of a contractor or subcontractor, who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement, including contracts and mortgages for interim financing, shall

0313 (La. 4/3/01), 783 So.2d 1269.

In *Cohn*, the defendant-contractor was convicted of criminal misapplication of funds, which the appellate court reversed. The Supreme Court granted the State's writ and reinstated the defendant's conviction. In so doing, the Supreme Court reasoned that the direct evidence in the record established that the defendant knowingly misapplied the funds.[30] Construing the criminal misapplication of funds statute, the Supreme Court stated:

> [T]he statute requires more than simply proof that a contractor has left unpaid claims for materials and labor at the end of a construction contract. The statute clearly does not criminalize a bad business deal made by a contractor who otherwise applies all of the funds received under the contract for legitimate expenses and claims for materials and labor in the course of the project, although he cannot pay all of them because, for one reason or another, the project has exceeded its estimated costs.

*Cohn*, 00–0313, p. 8, 783 So.2d at 1275–76.

Contrary to Boes' contention, the facts in this case are distinguishable from those in *Cohn*. Here, no direct evidence of a knowing misapplication of funds was presented. To the contrary, the only evidence in the record supporting Boes' misapplica-tion of funds claim is Mr. Chigbu's testimony that his standard practice was to deposit funds into the general account and to use such funds to pay business-related expenses. The evidence presented in this case does not exclude the possibility that this was simply a "bad business deal." *Cohn, supra.* Boes' reliance on *Cohn* is thus misplaced. We thus find no error in the trial court's finding that Boes failed to prove Mr. Chigbu knowingly misapplied the funds owed to Boes. Thus, we find Boes' contention that it was entitled to penalties under La. R.S. 9:4814 is unpersuasive.

### Interest issue

■■■ Boes contends that the trial court erred in awarding interest from the date of judicial demand; it contends that it is entitled to interest on the amounts due and owing from the time the debts became due pursuant to La. C.C. art. 2000.[31] Boes also points out that the jurisprudence has held that contractors are entitled to interest from the date of substantial completion or when payment was due until paid, not from the date of judicial demand. *See EDAW, Inc. v. New Orleans East, Inc.*, 528 So.2d 168 (La. App. 4th Cir. 1988).

In its written reasons, the trial court cited *Alexander v. Burroughs Corp.*, 359 So.2d 607, 613 (La. 1978), for the proposi-

---

knowingly fail to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract.

**30.** The Supreme Court noted the evidence on which it relied to reinstate the defendant's conviction was as follows:

> [T]he State presented direct evidence in the form of bank records and the state's "data base" to prove that suppliers were not paid because TCM [the contractor] did not apply all the money it received from the each owner to the labor and material bills it incurred on each respective owner's job. Second, in this case there were two victims and the bank records clearly show that

money from one victim was being used to settle claims belonging to another victim and vice versa, and that in the end, materialmen from both jobs were not paid. Finally, there were numerous materialmen liens filed in this case.

*Cohn*, 00–0313 at pp. 8–9, 783 So.2d at 1276.

**31.** La. C.C. art. 2000 provides as follows:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500.

tion that Boes was only entitled to interest from the date of judicial demand. Quoting *Alexandria*, the trial court stated that " 'all sums due on contracts bear interest from judicial demand, even where none has been stipulated, and the demand is unliquidated.' " 359 So.2d at 613 (quoting *Sullivan v. Williams*, 2 La.Ann. 876, 878 (1947)). Given that the *Alexander* case was decided before La. C.C. art. 2000 was enacted, Boes contends the trial court's reliance on that case was misplaced. Because we find the trial court did not err in awarding interest from the date of judicial demand for a different reason, we find it unnecessary to decide whether the trial court's reliance on *Alexander* was misplaced.

Although the general rule in breach of contract cases is that judicial interest runs from the date of breach, the Louisiana Supreme Court recognized an exception to this rule in *Trans–Global Alloy Limited v. First National Bank of Jefferson Parish*, 583 So.2d 443 (La. 1991), for "highly complicated" cases. The Supreme Court distinguished the simple case in which the amount owed was both due and easily ascertainable on the date from which interest was awarded from the complicated case before it in which "three courts ... had difficulty in determining whether there was a breach meriting compensation, and what the consequential damages of that breach should be." *Trans–Global*, 583 So.2d at 459. The Supreme Court held that in such a "highly complicated" case interest runs from the date of judicial demand.

Invoking the "highly complicated" case exception, the court in *Ashy v. Trotter*, 04–612, p. 21 (La.App. 3 Cir. 11/10/04), 888 So.2d 344, 357, reasoned as follows:

> While it is generally true that judicial interest should accumulate from the date of breach in contract cases, as opposed to the date of judicial demand, the supreme court in *Trans–Global Alloy* ... held that in "highly complicated" cases where the issues are whether a breach has occurred and the appropriate damage amount, it is appropriate to award interest from the date of judicial demand. We find this case falls into the "highly complicated" category. It involves issues of whether a contract even existed and to what extent the contract terms extended.

As in *Ashy*, we find this case falls into the "highly complicated" category. Complicating factors in this case included the following:

- This is not a simple case in which the plaintiff is seeking to recover an undisputed amount due from a debtor as of a particular date. At trial, Mr. Boes acknowledged that the original agreement between the parties included a "pay-when-paid" term. The exact date on which Entergy paid Gee Cee Company was never established at trial. At best, it was established this occurred "sometime in 2003."

- Mr. Boes also acknowledged that "if Mr. Chigbu had timely paid Boes once he was paid by Entergy, no attorney fees or interest would have been due."

- The original debtor, Gee Cee Company, is no longer in business. This suit involves an attempt to collect from a successor company, Gee Cee LA, and the president of both entities, Mr. Chigbu.

- A lapse of over a decade occurred between when the initial debt was incurred and suit was filed to collect it.

- Whether Gee Cee LA is indebted for only the original principal balance or the principal balance plus interest was disputed.

- Finally, whether the applicable interest rate was the specific rate set forth on the Invoices or the judicial interest rate was disputed.

Given these complicating factors, we find the trial court did not err in finding that Boes was entitled to interest from the date of judicial demand.

*Attorneys' fees*

Boes challenges the trial court's award of $8,000.00 in attorneys' fees as inadequate. In Louisiana, an award of attorneys' fees is not allowed except when authorized by statute or contract. *Rivet v. State, Dep't of Transp. & Dev.*, 96–0145, p. 10 (La. 9/5/96), 680 So.2d 1154, 1160 (citing *State, DOTD v. Williamson*, 597 So.2d 439, 441 (La. 1992)). As noted earlier, the basis for the $8,000.00 attorneys' fee award to Boes is not the terms of the Invoices; rather, it is part of the penalty awarded to Boes under the prompt pay statute.[32]

The determination of a reasonable attorneys' fee is determined on a case-by-case basis based on the facts of each individual case. *Filson*, 07–0755 at p. 6, 990 So.2d at 67 (citing *Gottsegen v. Diagnostic Imaging Servs.*, 95–977, p. 7 (La.App. 5 Cir. 3/13/96), 672 So.2d 940, 943). Based on Rule 1.5(a) of the Rules of Professional Conduct, the Louisiana Supreme Court in *State, Dep't of Transp. and Dev. v. Williamson*, 597 So.2d 439 (La. 1992), enumerated a list of ten factors to be considered in making that determination.[33]

At the hearing to fix attorneys' fees and costs, the trial court acknowledged on the record that Boes' counsel had done "a lot of work" on this case. Also at the hearing, Boes' counsel acknowledged that Boes' request for an attorneys' fee award of $35,132.00 was "shocking on its face, given the amount of the judgment, $20,000." Boes' counsel, however, emphasized that Boes was requesting the actual amount of attorneys' fees that it incurred. Rejecting Boes' contention that it was entitled to attorneys' fees in the amount Boes' actually incurred, the trial court orally reasoned as follows:

> The Court has specifically gone through all of the bills that were submitted by counsel for Boes Ironworks. There was, in fact, a lot of motion practice. There was, in fact, a lot of work done. However, the Court finds that even an award of attorneys' fees of $8,000 is nearly 50 percent of the [amount sued upon] ... I do believe that an extensive amount of work was, in

---

**32.** *See* La. R.S. 9:2784 C (providing that "any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim.").

**33.** The *Williamson* factors are as follows: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and the (10) the court's own knowledge. 597 So.2d at 442.

In *Troth Corp. v. Deutsch, Kerrigan & Stiles, L.L.P.*, 06–0457, p. 3 (La.App. 4 Cir. 1/24/07), 951 So.2d 1162, 1165, this court likewise outlined the factors a trial court should consider in determining a reasonable attorneys' fee award, noting those factors include the following: "[u]ltimate results obtained; responsibility incurred; importance of the litigation; amount involved; extent and character of labor performed; legal knowledge; attainment and skill of the attorney; number of appearances made; intricacies of facts and law involved; diligence and skill of counsel; court's own knowledge; and ability of party liable to pay." *Id.* (quoting *S. Jackson & Son, Inc. v. Aljoma Lumber, Inc.*, 93–2531 (La. App. 4 Cir. 5/26/94), 637 So.2d 1311, 1313).

fact, done, but I believe that it would not be equitable to award more than $8,000.

On appeal, Boes contends that the trial court erred in focusing on the amount sued upon in setting the attorneys' fee award. Boes emphasizes that the jurisprudence has recognized that, in appropriate circumstances, attorneys' fees at or above the principal amount claimed may be awarded. In support, Boes cites *Troth, supra;* and *South Texas Pioneer Millwork v. Favalora Constructors, Inc.,* 11–722 (La.App. 5 Cir. 3/13/12), 90 So.3d 1092. Boes contends that this court should find the trial court abused its discretion in limiting its attorneys' fees to $8,000.00 given the *Troth* and *South Texas Pioneer* cases, the ultimate outcome in Boes' favor, and the "extensive" work performed by its attorney, which the trial court acknowledged multiple times. Boes requests that this court reverse the award of $8,000.00 and amend the judgment to award attorneys' fees in the amount of $35,132.00—the amount of attorneys' fees Boes actually incurred as evidenced by its attorney's unredacted fee statements.[34]

Louisiana appellate courts, as Boes emphasizes, have affirmed attorneys' fee awards in excess of the amount sued upon.[35] In this case, however, we find that the trial court did not abuse its discretion in awarding $8,000.00 in attorneys' fees. Equity, as the trial court noted, was a factor in the determination of the appropriate attorneys' fee award. As noted above, the attorneys' fee award in this case is a part of the penalty award under the prompt pay statute. The attorneys' fee award of $8,000.00, when compared to the penalty of $4,998.00, was clearly reasonable. Likewise, the attorneys' fee award, when compared to the total judgment amount ($16,820.00 in principal, $4,998.00 in penalties, and judicial interest) is reasonable.

Finally, the deference given the trial court judge on the issue of the reasonableness of an attorneys' fee award is "a recognition of the trial judge's greater familiarity with the issues involved in the overall case and with the specific value of the services rendered by the attorney whose fee is under consideration." *Billieson v. City of New Orleans,* 15–0858, p. 6 (La.App. 4 Cir. 1/27/16), 186 So.3d 786, 790.[36] Here, the trial court judge was aware of the nature of the case, the ultimate outcome, and the work that Boes' counsel had performed to achieve that outcome. Indeed, as Boes emphasizes, the trial court judge expressly stated multiple times on the record that Boes' counsel had done "a lot of work." The trial court judge

---

34. Boes did not request an award for the attorneys' fees it incurred on appeal.

35. *See Brandner v. Staf–Rath, L.L.C.,* 12–62, pp. 7–8 (La.App. 5 Cir. 5/31/12), 102 So.3d 186, 191 (citing *Dailey v. The Home Furnishings Store,* 02–1225 (La.App. 4 Cir. 9/17/03), 857 So.2d 1051; *Acadian Gas Pipeline System v. Bourgeois,* 04–578 (La.App. 5 Cir. 11/30/04), 890 So.2d 634; *Garden Lakes Condominium Homeowners Ass'n, Inc. v. Perrier,* 10–1016 La.App. 5 Cir. 5/24/11), 66 So.3d 1147; *South Texas Pioneer Millwork, supra* ).

36. *See also 1001 Harimaw Court E., L.L.C. v. Blo, Inc.,* 10–860, p. 5 (La.App. 5 Cir. 5/24/11), 66 So.3d 1131, 1134 (noting that because the trial court judge presides over the case, the judge's "inherent familiarity with the work of the attorneys, the complexity of the issues, the effort put forth, and the time invested additionally justify the significant deference afforded to the amount of attorneys' fees awarded"); *Filson v. Windsor Court Hotel,* 07–0755, pp. 6–7 (La.App. 4 Cir. 7/23/08), 990 So.2d 63, 67 (citing *Custom–Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc.,* 32,441 (La.App. 2 Cir. 12/8/99), 748 So.2d 594, 602–03) (noting that the determination of the amount of an attorneys' fees award is within the ultimate discretion of the trial court "based on the court's own knowledge, on the evidence, and on the court's observation of the case and the record.").

thus factored all these considerations into her determination of an appropriate attorneys' fee award. Absent a finding of an abuse of discretion, we cannot reverse that award. Based on the circumstances of this case, we cannot say that the $8,000.00 attorneys' fee award was an abuse of discretion.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED.**

2016-503 (La.App. 3 Cir. 12/7/16)